BROWN COUNTY, Petitioner-Appellant,

v.

LABOR & INDUSTRY REVIEW COMMISSION and John Toonen, Respondents-Petitioners.

Supreme Court

*No. 83-2324. Argued January 31, 1985.—*
*Decided June 28, 1985.*

(Also reported in 369 N.W.2d .735.)

For the respondent-petitioner, Labor and Industry Review Commission, the cause was argued by *David C. Rice,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the respondent-petitioner, John Toonen, there were briefs by *Lise Lotte Gammeltoft* and *Kaftan, Kaftan, Van Egeren, Ostrow, Gilson, Geimer and Gammeltoft, S.C.,* Green Bay, and oral argument by *Lise Lotte Gammeltoft.*

For the petitioner-appellant there was a brief and oral argument by *John C. Jacques,* assistant corporation counsel.

HEFFERNAN, CHIEF JUSTICE. This is a review of a decision of the court of appeals[1] which reversed a judgment of the circuit court for Brown county, Richard G. Greenwood, circuit judge, affirming an order of the Labor and Industry Review Commission (L.I.R.C.) holding that John Toonen was a visually handicapped person and was discriminated against by Brown county. We conclude that John Toonen was a visually handicapped person. Accordingly, we reverse the court of appeals' holding and remand the cause to that court to review whether the L.I.R.C. correctly concluded, on the basis of properly admitted evidence, that Brown county's refusal to hire Toonen violated sec. 111.32(5) (f), Stats. 1979–80.

---

[1] Unpublished opinion dated July 24, 1984.

The sole issue posed on this review is whether a job applicant, applying for a position as traffic officer with the Brown County's Sheriff's Department, rejected because his uncorrected vision—20/400 in each eye—does not meet the employer's standard, is a "handicapped" person afforded protection under the Wisconsin Fair Employment Act (W.F.E.A.). We conclude that the applicant is a handicapped person within the meaning of the Act and must, therefore, be given an individual opportunity to be determined as properly qualified or not qualified for the job.

This case arises under the procedures established by the W.F.E.A., sec. 111.31–111.37, Stats. 1979–80. The basic policy of the W.F.E.A. is that persons shall be judged on their individual merits—i.e., whether or not they are properly qualified for a particular job—and are not to be barred from the individual opportunity of showing qualifications, because they are, or are considered to be, handicapped persons. The general policy of the law is stated in the legislative declaration at sec. 111.31, Stats. 1979–80.[2] It is strongly stated:

[2] Sec. 111.31, Stats. 1979–80, provides:

"**111.31 Declaration of policy.** (1) The practice of denying employment and other opportunities to, and discriminating against, properly qualified persons by reason of their age, race, creed, color, handicap, sex, national origin, ancestry, arrest record or conviction record, is likely to foment domestic strife and unrest, and substantially and adversely affect the general welfare of a state by depriving it of the fullest utilization of its capacities for production. The denial by some employers, licensing agencies and labor unions of employment opportunities to such persons solely because of their age, race, creed, color, handicap, sex, national origin, ancestry, arrest record or conviction record, and discrimination against them in employment, tends to deprive the victims of the earnings which are necessary to maintain a just and decent standard of living, thereby committing grave injury to them.

"(2) It is believed by many students of the problem that protection by law of the rights of all people to obtain gainful employment, and other privileges free from discrimination because of

". . . public policy of the state to encourage and foster to the fullest extent practicable the employment of all *properly qualified* persons regardless of their age, race, creed, color, handicap, sex, national origin or ancestry. This subchapter shall be liberally construed for the accomplishment of this purpose." (Emphasis supplied.) Sec. 111.31(3), Stats. 1979–80.

It is apparent that the policy of the state is not to assure employment to persons because they are handicapped. Rather, the policy is that persons who are "properly qualified" have the opportunity to work—*i.e.*, are not discriminated against because they are handicapped persons.

Nevertheless, persons who physically or otherwise are unable to perform duties of their employment are not protected from termination (sec. 111.32(5)(c), Stats. 1979–80),[3] even though they are persons in the class

age, race, creed, color, handicap, sex, national origin or ancestry, would remove certain recognized sources of strife and unrest, and encourage the full utilization of the productive resources of the state to the benefit of the state, the family and to all the people of the state.

"(3) In the interpretation and application of this subchapter, and otherwise, it is declared to be the public policy of the state to encourage and foster to the fullest extent practicable the employment of all properly qualified persons regardless of their age, race, creed, color, handicap, sex, national origin or ancestry. This subchapter shall be liberally construed for the accomplishment of this purpose.

"(4) The practice of requiring employes or prospective employes to submit to honesty tests without providing safeguards for the test subjects is unfair, and the use of improper tests and testing procedures causes injury to the employes and prospective employes."

[3] Sec. 111.32(5)(c), Stats. 1979–80, provides:

"(c) Nothing in this subsection shall be construed to prevent termination of the employment of any person physically or otherwise unable to perform his duties, nor to affect any retirement policy or system of any employer where such policy or system is not a subterfuge to evade the purposes of this subsection, nor to preclude the varying of insurance coverage according to an em-

afforded protection by the W.F.E.A. Moreover, it is explicit that it is not discrimination to refuse to hire a handicapped person, or to terminate such person's employment, if the "handicap is reasonably related to the individual's ability adequately to undertake the job-related responsibilities of that individual's employment . . . ." Sec. 111.32(5)(f), Stats. 1979–80.[4]

In broad outline, then, the W.F.E.A. means that persons in the protected categories, including the handicapped, shall be hired or fired on the basis of whether they, in fact, can perform on the job.

The issue posed on this review involves only the first element in a handicap discrimination case.[5] If the com-

ploye's age; nor to prevent the exercise of an age distinction with respect to employment of persons in capacities in which the knowledge and experience to be gained might reasonably be expected to aid in the development of capabilities required for future advancement to supervisory, managerial, professional or executive positions."

[4] Sec. 111.32(5)(f), Stats. 1979–80, provides:

"(f) It is discrimination because of handicap:

"1. For an employer, labor organization, licensing agency or other person to refuse to hire, employ, admit or license, or to bar or to terminate from employment, membership or licensure any individual, or to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment unless such handicap is reasonably related to the individual's ability adequately to undertake the job-related responsibilities of that individual's employment, membership or licensure.

"2. For an employer to contribute a lesser amount to the fringe benefits, including life or disability insurance coverage, of any employe because of a handicap."

[5] In a handicap discrimination case arising under the W.F.E.A., secs. 111.31 *et seq.*, Stats. 1979–80, there are three essential elements of proof. First, there must be proof that the complainant is handicapped within the meaning of the Fair Employment Act. *Boynton Cab Co. v. ILHR Dept.*, 96 Wis. 2d 396, 406, 291 N.W.2d 850 (1980); *Samens v. LIRC*, 117 Wis. 2d 646, 658, 345 N.W.2d 432 (1984). The burden of proving a handicap is on the complainant. *American Motors Corp. v. LIRC*, 119 Wis. 2d 706, 710, 350 N.W.2d 120 (1984). Second, the complainant must establish that

plainant meets his initial burden of proof that he was rejected on the ground that he is a handicapped person or was perceived by the prospective employer as a handicapped person, he has, under the law, an opportunity to be hired unless the employer can demonstrate the lack of proper qualifications for employment. The finding of "handicap" status is merely a predicate for the opportunity under the W.F.E.A. to ask the employer to demonstrate that the handicap is reasonably related to the applicant's ability to perform the job.

The underlying facts are these.

The record shows that in May, 1977, John Toonen applied for a job as a deputy sheriff with the Brown County Sheriff's Department. He was well qualified by experience and education for the position. He had served as a military police officer and had received an associate degree in police science. Before applying for employment with Brown county, he had served without any difficulties as a jail deputy, a dispatcher, and a traffic patrolman in Shawano county. He was told by the Brown County Sheriff's Department that, upon the basis of his preliminary examination and experience, he would be hired as a traffic patrol officer by the county if he passed the physical. The physician examining for the county reported, however, that Toonen's uncorrected vision in each eye, 20/400,[6] failed to meet the county's

the employer's discrimination was based on the handicap. *Boynton Cab, supra; Samens, supra.* The burden then shifts to the employer to establish, if it can, that its alleged discrimination was permissible under sec. 111.32(5)(f), Stats. 1979–80, which allows an employer to refuse to hire a handicapped applicant if "such handicap is reasonably related to the individual's ability adequately to undertake the job-related responsibilities of that individual's employment . . . ." *Boynton Cab, supra; Samens, supra; American Motors Corp., supra.*

[6] Whether the Snellen reading was identical in each eye is unclear, but for purposes of these proceedings, 20/400 has been

uncorrected requirement of 20/40 in the better eye and 20/100 in the poorer eye. By use of glasses or contact lenses, Toonen's vision was corrected to 20/20. Because his uncorrected vision did not meet the hiring standard of the sheriff's department, Toonén was not hired.

In March of 1980, Toonen filed a complaint with the Department of Industry, Labor and Human Relations (DILHR) alleging that Brown county had discriminated against him on the basis of handicap. The record developed at a hearing in March, 1981, before a DILHR hearing examiner reveals that Toonen never had any difficulty in performing his duties as a traffic officer because of his vision—that he had on occasion in the course of duty been in fights, sustained blows to the head, but had never lost his contact lenses. There was expert testimony that modern contact lenses were very unlikely to be dislodged, and even if one were lost, a person could see adequately with one lens. There was also evidence that patrolmen on the job with Brown county were not required to maintain the entrance level of uncorrected visual acuity and that serving traffic officers had visual acuity that did not meet the hiring standard.

In May, 1981, the hearing examiner issued her decision. The hearing examiner found that Toonen was handicapped because of his visual impairment, that he had met the required burden under the Act to show that he was denied employment because of his handicap, and that Brown county had failed to meet its burden of showing that Toonen's handicap was reasonably related to his ability to perform on the job. The examiner held that Brown county had discriminated against Toonen in violation of W.F.E.A. and ordered Brown county to offer Toonen the next available position and to pay him back pay from January 1, 1980.

accepted by the parties—*i.e.,* Toonen could see at 20 feet what a person with 20/20 vision could see at 400 feet.

An appeal to the full commission by the county affirmed the examiner's determination of handicap, and the commission's opinion recited:

"Respondent [county] concedes that Complainant is handicapped in a physical sense by virtue of his vision impairment."[7]

There was no dispute that the failure to hire was because of the acuity level of Toonen's vision as uncorrected. The commission also concluded that the county had failed to show that its denial of employment was because Toonen's handicap either made him unable to perform the job responsibilities or would make employment hazardous for Toonen or other workers.

Upon judicial review brought in the circuit court for Brown county, the court, without extended decision, specifically affirmed the decision of the commission.

Upon appeal to the court of appeals, that court never reached the commission's findings that the county had failed to prove that Toonen could not perform satisfactorily, because it held that Toonen had not met his threshold burden of showing that he was a person protected under the Act—a handicapped person.

The court of appeals relied upon *American Motors v. LIRC,* 119 Wis. 2d 706, 350 N.W.2d 120 (1984), decided by this court while the instant case was pending in the court of appeals. This court in *American Motors* was attempting to give a rational and not an overly broad meaning to the word, "handicap." It held, in the context of that case, that a woman four-feet-ten-inches in height did not have "a disability or impairment" (at 716) and that her height was not such a substantial deviation from the norm as to make achievement unusually

---

[7] Thus, the issue which this opinion primarily addresses, and which is hotly argued at this juncture, was apparently conceded at the commission level. Only when the court of appeals became enmeshed in its erroneous interpretation of *American Motors* did a question of "handicap" arise.

difficult or to limit the capacity to work, and thus her short stature did not constitute a handicap, as this court defined "handicap" in *Chicago, Milwaukee, St. Paul & P. RR. Co. v. ILHR Dept.*, 62 Wis. 2d 392, 396, 215 N.W. 2d 443 (1974).[8]

The court in *American Motors* further defined "handicap" as:

".  .  . an injury, deterioration or lessening that could impede a person's normal functioning in some manner and preclude the full and normal use of one's sensory, mental or physical faculties." (At 713)

The court in *American Motors* also stated that slight stature would not be considered a handicap, although it recognized that we determined in *Dairy Equipment Co. v. ILHR Dept.*, 95 Wis. 2d 319, 290 N.W.2d 330 (1980), that a "perceived" handicap was to be treated as a handicap under the W.F.E.A. We said in *American Motors* that we did so in *Dairy Equipment* only because there was, in *Dairy Equipment*, an actual impairment—i.e., only one kidney—which was perceived as a handicap and used as an excuse for nonhiring even though the impairment, in fact, did not hinder the job applicant in his job performance. Hence, this court in *American Motors* held that, for there to be a perceived handicap,

---

[8] This court, consistent with the legislative intent of the W.F.E.A., could perhaps have reasoned in *American Motors* that the short stature of the job applicant and the hypothetical basketball player referred to in that case disqualified them from employment because they were not physically able to perform the duties of the jobs for which they had applied, whether or not they were denominated as "handicapped." *See, E. E. Black, Ltd. v. Marshall*, 497 F. Supp. 1088, 1100 (D.C. Hawaii, 1980), 26 FEP Cases 1183 (D.C. Hawaii, 1981); Haines, *E. E. Black, Ltd. v. Marshall: A Penetrating Interpretation of "Handicapped Individual" for Sections 503 and 504 of the Rehabilitation Act of 1973 and for Various State Equal Employment Opportunity Statutes*, 16 Loy. L.A. L. Rev. 527, 555 n 113 (1983).

there must be an actual impairment, which need not, in fact, be a handicap to job performance.[9]

The court of appeals in the instant case seized on the language of *American Motors* to hold that Toonen had no handicap, either actual or perceived. It reasoned that:

"Our conclusion is compelled by the supreme court's reference in *American Motors* to 'a slightly nearsighted person who wears glasses and who is rejected for a position requiring 20/20 uncorrected vision' as an example of a physical characteristic imposing some limitations but not amounting to a handicap." (Slip opinion at page 563).

Thus, the court of appeals equated the applicant Toonen, whose visual acuity measured by the Snellen test for nearsightedness is diminished by 96.7 percent, to the hypothetical "slightly nearsighted person" referred to in dicta in *American Motors*. The analogy is strained.

What is significant in *American Motors*, which the court of appeals overlooked, is that *American Motors* reaffirmed that, where there is an actual impairment and that impairment is regarded by the prospective employer as limiting the capacity to work, it is a perceived handicap and is to be treated as a handicap which makes achievement unusually difficult or limits the capacity to work—even if, in fact, it does neither. The court of appeals did not follow through on the analysis suggested

---

[9] *American Motors* and *Dairy Equipment* both recognized that a job applicant would also be perceived as handicapped if he had no physical limitation or condition at all but was erroneously thought by the employer to have an impairment that limited his capacity to work. *Dairy Equipment*, 95 Wis. 2d at 330, citing *Barnes v. Washington Natural Gas Co.*, 22 Wash. App. 576, 591 P.2d 461 (1979) (perceived handicap exists where employer erroneously believes applicant to have epilepsy); *American Motors*, 119 Wis. 2d at 717. That situation is not present in the instant case because Toonen and Brown county agree that his uncorrected visual acuity is very poor.

by *American Motors*. Because the court of appeals held, erroneously we conclude, that Toonen had no impairment, it used only the *American Motors'* definition of an actual handicap in its analysis and never addressed the possibility of a perceived handicap as defined in *American Motors* and *Dairy Equipment.*

Whether or not there was a "perceived handicap" is a significant issue in this case, because the rationale of the employer is that the impairment of vision is perceived by the employer as being a disqualification that will prevent adequate performance on the job even though the county has not assumed its burden of showing that the impairment, a perceived handicap, was disqualifying.

The standard of review that we apply in this case and the standard consistent with that used in other cases brought under W.F.E.A. is whether there is a rational basis for the commission's conclusion, here the conclusion that Toonen's visual acuity of 20/400 uncorrected constituted a handicap under the Act, either in actuality or as an impairment of function which was perceived by the prospective employer as a handicap. *Dairy Equipment*, 95 Wis. 2d at 327–28; *Bucyrus-Erie Co. v. ILHR Dept.*, 90 Wis. 2d 408, 417, 280 N.W.2d 142 (1979). This is because we have defined handicap either as an actual handicap or a perceived one—and it is our duty under the policy declaration of the Act to support the commission in its liberal interpretation of handicap to implement the basic legislative intent of not permitting the denial of employment of persons who are either handicapped but can perform efficiently, or are not handicapped at all although they may have some actual impairment that would lead to a perception of a handicap.

We have stated the meaning of handicap and defined it in numerous cases since the original passage of the W.F.E.A.

In *Chicago, Milwaukee & St. Paul, supra,* we gave a broad meaning to the term, handicap, holding that it did not mean that one must be disabled to the extent that one is barred from all remunerative occupation—a detriment to an employer and in need of rehabilitative training. Rather, we said a handicapped person is one who, despite being different from the average employee in one or more ways, might nevertheless function efficiently on the particular job.

In *Chicago, Milwaukee & St. Paul,* we also adopted the definition which is now found in the current statutes. Although this statutory definition was not adopted prior to the events in the instant case, the definition is gleaned from cases decided by this court which are antecedent to the facts at issue here. Hence, we consider the present statute, sec. 111.32(8), Stats. 1983–84, to be declaratory of our case law definitions:

"(8) 'Handicapped Individual' means an individual who:

"(a) Has a physical or mental impairment which makes achievement unusually difficult or limits the capacity to work;

"(b) Has a record of such an impairment; or

"(c) Is perceived as having such an impairment."[10]

In the instant case, the situation that presents itself is that Toonen has an actual impairment—the 96.7 percent loss of distance vision in each eye—which the employer mistakenly perceives as limiting the capacity to work, or mistakenly believes will make achievement unusually difficult when in fact all the evidence thus far adduced indicates that, despite the impairment—which is

[10] As pointed out *supra,* the "perceived" component came into our law by virtue of the *Dairy Equipment* case, *supra.* The general definition under sec. 111.32(8)(a), Stats. 1983–84, stems from the *Chicago, Milwaukee & St. Paul* case.

real—the work can be performed efficiently by the use of corrective lenses.

In the instant case, because the court of appeals erroneously found that Toonen was not handicapped within the meaning of the W.F.E.A., it never explored the question of whether Brown county erroneously and without proof concluded that Toonen was not qualified to perform. The only question before us is whether Toonen is a handicapped person entitled to protection of the Act. We conclude that he is handicapped and protected, because he is, without doubt, visually impaired to a serious degree. He met the test of perceived handicap restated by this court in *American Motors*. The impairment was actual, but the employer was, arguably at least, mistaken in its perception that he was handicapped, because with corrective lenses his capacity to work was unimpaired.

Under the definition of what it is to be considered under the Act as a perceived handicap, as established in *Dairy Equipment* and *American Motors*, Toonen must initially be treated as a handicapped person. Here, the complainant proved that he had an actual impairment of visual acuity; and, although that impairment might well have not disqualified Toonen from work generally, the evidence is clear that Brown county perceived the impairment as one that limited Toonen's capacity to work at the specific job for which he applied. While that perception, in light of the actual impairment, is sufficient to establish that Toonen was "handicapped," it should be remembered that this step in the process of proof under the Act only permits a complainant to bring suit as a handicapped person under the W.F.E.A. and does not guarantee him a successful outcome in the sense that he is to be afforded the particular job sought. The employer still has the opportunity under the Act to prove that the standard it has set in respect to uncor-

rected vision is not discriminatory, because it is reasonably related to Toonen's ability to actually perform the job requirements. Thus, on remand the court of appeals must consider the county's proof that Toonen is not, under the terms of the Act, properly qualified to perform the duties of a traffic officer.

In conclusion, then, Toonen was perceived by the prospective employer as being handicapped, because he had an impairment which the county believed would limit his ability to perform the particular job.

Accordingly, under our cases, he must be considered handicapped within the meaning of the W.F.E.A. There is no doubt that the county perceived him as handicapped, because it rejected him solely for his failure to meet the uncorrected vision standards which it required for employment eligibility. The county believed, in other words, that Toonen's visual impairment limited his ability to perform on the job. Therefore, under the facts as developed to date in these proceedings, it appears that Toonen has been categorized as a handicapped person and, on the basis of that categorization, has been denied the opportunity to work at a particular employment, even though he may, in fact, be properly qualified. This is exactly the type of treatment which the Wisconsin Fair Employment Act denominates as discriminatory and prohibits. The burden, accordingly, now falls upon the county to show that Toonen cannot perform the work. Because at least some of the facets of the county's possible proof were apparently before the court of appeals but were not thought necessary to consider because of that court's inaccurate interpretation of *American Motors,* the case is remanded to the court of appeals to determine whether the county has assumed its burden in proving that Toonen is unqualified.

*By the Court.*—Decision reversed, and cause remanded.

SHIRLEY S. ABRAHAMSON, J. (concurring). According to *Dairy Equipment Co. v. ILHR Dept.*, 95 Wis. 2d 319, 290 N.W.2d 330 (1980), and the majority opinion in the present case, a man with one kidney instead of two and a man with a 96.7 percent diminution of visual acuity (correctable to 20/20 vision) have actual impairments[1] which may serve as the basis of a "perceived" handicap. According to *American Motors Corp. v. L.I.R.C.*, 119 Wis. 2d 706, 350 N.W.2d 120 (1984), a woman who is four-feet-ten-inches tall does not have an actual impairment or disability which can serve as the basis of a "perceived" handicap because her "stature [is not] such a substantial deviation from the norm that it makes achievement unusually difficult or limits her capacity to work." *Id.* at 716. Yet women four-feet-ten and shorter comprise less than 2 percent of the female population between the ages of 18 and 74. U.S. Dept. of Health, Education and Welfare, *Weight and Height of Adults 18–74 Years of Age, United States, 1971–74*, 27 (DHEW Publication No. (PHS) 79–1659, May 1979).

This court's rulings lack the consistency and guidance that the Labor and Industry Review Commission, the circuit courts, and the court of appeals need in order to determine whether an employer may perceive a particular "deviation from the norm" as a handicap.[2] I would

---

[1] Brown county argues that because the applicant's uncorrected vision was correctable by glasses or contact lenses to "normal" vision, the test for determining an actual impairment under *American Motors* should be applied to the applicant's corrected vision. Defective vision correctable to normal vision, like short stature, is not an actual impairment but is merely an individual's normal limitation, argues Brown county. Society does not consider vision that is correctable by glasses or contact lenses to 20/20 to be an actual impairment or a handicap. Actual visual impairment is total blindness or corrected vision that is inadequate for ordinary activity for which sighted persons rely on their eyes.

[2] The majority identifies three "essential elements of proof" for a handicap discrimination case arising under the Wisconsin

have preferred that the court today withdraw the language of *American Motors* which appears to limit a perceived handicap to a situation in which there is present an actual impairment, that is, an injury, deterioration or lessening, or an actual disability, that is, a "substantial deviation from the norm that makes achievement unusually difficult or limits . . . capacity to work." *See American Motors*, 119 Wis. 2d at 713–14, 716.[3]

---

Fair Employment Act. At page 564, n 5. Furthermore, it sets these elements out as sequential steps:

"First, there must be proof that the complainant is handicapped within the meaning of the Fair Employment Act. . . . Second, the complainant must establish that the employer's discrimination was based on the handicap. . . . The burden then shifts to the employer to establish, if it can, that its alleged discrimination was permissible under sec. 111.32(5)(f), Stats. 1979–80, which allows an employer to refuse to hire a handicapped applicant if 'such handicap is reasonably related to the individual's ability adequately to undertake the job-related responsibilities of that individual's employment. . . .' " *Id.* (Citations omitted.)

The majority works hard to preserve the separateness of these determinations. Although it emphasizes that the third step is not now before the court, p. 572, one way of reconciling the categorizations in *Dairy Equipment, American Motors* (including the reference to the five-foot-six-inch Milwaukee Bucks hopeful), and now in the present case would be to conclude that in each case, despite its avowal of the separateness of the elements, the majority grants the applicant the Act's protection on the majority's own confidence that the applicant could do the job for which he or she had applied. This conclusion is reinforced in the present case by the facts that Toonen had successfully served in similar jobs in the past, *cf.* at p. 565, "that patrolmen on the job with Brown county were not required to maintain the entrance level of uncorrected visual acuity and that serving traffic officers had visual acuity that did not meet the hiring standard." *Id.* at 566.

[3] The majority opinion in this case attempts to avoid the pitfall of *American Motors* in which the majority described actual impairment or disability—which must exist to allow the employer to perceive the person as handicapped—in terms of a physical condition which makes achievement unusually difficult or which limits the capacity to work. *See American Motors*, 119 Wis. 2d at 713, 716.

Despite my departure from the majority's adherence to *American Motors,* I concur in the judgment. The policy underlying the Wisconsin Fair Employment Act is to discourage employers from establishing exclusionary categories resting on a person's physical condition and unrelated to the requirements of the job or to the individual's capacity to do the job. The message in the majority opinion on the legislature's instruction that the Act be liberally construed is loud and clear, and the result in this case is appropriately consistent with, and supportive of, that policy.